**IN THE UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **FOSTER POULTRY FARMS,** | CV F 04-5810 AWI LJO |
| **Plaintiff,** | **ORDER RE: APPEAL OF MAGISTRATE JUDGE'S DENIAL OF MOTION TO DISQUALIFY COUNSEL** |
| **v.** | |
| **CONAGRA FOODS REFRIGERATED FOODS CO., INC. f/k/a SWIFT-ECKRICH, INC. d/b/a BUTTERBALL TURKEY COMPANY,** | |
| **Defendant.** | |

Defendant has made a motion to disqualify Plaintiff's counsel. The motion was referred to Magistrate Judge Lawrence J. O'Neill who dismissed the motion. Defendant objects to the ruling, asking the district court to set aside the Magistrate Judge's order. Plaintiff filed an opposition to Defendant's objections.

**I. History**

Plaintiff Foster Poultry Farms, Inc. ("Foster") and Defendant ConAgra Foods Refrigerated Foods Co., Inc. ("ConAgra") are large food processing companies which deal in chicken and turkey products as part of their businesses. James Rill and Christopher MacAvoy were originally partners of the antitrust law firm Collier Shannon. In April 2000, Mr. Rill and Mr. MacAvoy joined Howrey, Simon, Arnold & White ("Howrey"). Mr. Rill is Co-Chair of Howrey's Antitrust Practice. Doc. 15, Roe Declaration, at 2:14. Mr. Rill and Mr. MacAvoy (and

1

1    associates who have worked with them) have represented ConAgra on various antitrust related

2    matters over the 1986 to 2003 period. Doc. 14, ConAgra's Memo, at 1:18-21.  In 2003, Howrey

3    (through Mr. Rill, Mr. MacAvoy and eight associates), represented ConAgra in examining the

4    antitrust implications of the sale of its fresh chicken business to third party Pilgrim's Pride in

5    return for Pilgrim's Pride stock, an action named "Project Mayflower." Doc. 13, ConAgra's

6    Motion to Disqualify, at 2:20-28.  ConAgra prepared a Hart-Scott-Rodino filing ("HSR") with

7    the Department of Justice regarding the transaction; there were no governmental objections. Doc.

8    35, ConAgra's Objections, at 4:4-5.  The work was done in conjunction with the law firm of

9    McGrath North, ConAgra's corporate counsel.  Howrey billed ConAgra $72,490.58 for 213.50

10   hours of work on Project Mayflower in June 2003. Doc. 15, Ex. 2, Billing Records.  ConAgra

11   claims that "Howrey's advice included an analysis of the proper definition of relevant antitrust

12   market and focused on whether merger of the two businesses might be subject to challenge under

13   the antitrust merger guidelines issued by the Department of Justice, including whether it would

14   likely create, enhance or facilitate the exercise of market power by the remaining participants in

15   the relevant poultry market." Doc. 14, ConAgra's Memo, at 2:24-28.  Foster claims that the

16   Project Mayflower representation "focused on the post-sale market position of Pilgrim's Pride

17   and the other firms that remained in the chicken business after the sale, not ConAgra. The

18   antitrust analysis and draft white paper examined the impact of the transaction on the fresh

19   chicken market, including possible submarkets, such as branded versus private label chicken, or

20   processed versus fresh chicken....Because both ConAgra and Pilgrim's Pride remained in the

21   turkey business, Howrey merely considered whether ConAgra's limited passive stock ownership

22   of a competitor raised any antitrust issues." Doc. 21, Foster's Opposition, at 11:7-28 (emphasis in

23   original).

24        In 1999, ConAgra procured a patent for a process of browning and/or smoking precooked

25   whole muscle meats such as turkey breasts (deli meat).  In 2001, third parties Unitherm Food

26   Systems and Jennie-O Foods sued ConAgra in the Western District of Oklahoma, claiming the

27   patent was invalid and unenforceable.  Foster (non-party in that case) was served with a subpoena

28   for documents in that case and was represented by the law firm of Howrey, Simon, Arnold &

2

1  White ("Howrey") in the matter. Doc. 21, Foster's Opposition, at 7:12-15.  ConAgra lost in

2  district court, and the Federal Circuit affirmed the invalidity of the patent in a July 12, 2004

3  opinion. Unitherm Food Sys. v. Swift-Eckrich, Inc., 375 F.3d 1341 (Fed. Cir. 2004).

4         On June 8, 2004 Foster filed the present suit against ConAgra, claiming ConAgra

5  violated the Sherman Antitrust Act by using a fraudulently procured patent to monopolize the

6  market for browned and smoked turkey.  Foster is represented by four Howrey attorneys

7  (different than the ten involved in Project Mayflower) in its suit against ConAgra.  Mr. Rill and

8  Mr. MacAvoy are based in Howrey's Washington, D.C. office where documents relating to

9  Project Mayflower are still kept. Doc. 25, Rill Declaration, at 3:15-16.  ConAgra notes that

10  "Howrey's lead trial attorney [Carmine Zarlenga] is located in the same Washington, DC office

11  and a member of the same antitrust group as the attorneys who represented ConAgra previously."

12  Doc. 35, ConAgra's Objections, at 2:13-15.  ConAgra first contacted Howrey about

13  disqualification by letter on June 30, 2004.  On July 1, 2004, Howrey circulated an internal

14  memorandum advising the firm that an ethical wall was being set up between the four attorneys

15  representing Foster and the ten attorneys who worked on Project Mayflower, providing that the

16  lawyers should not speak to each other or access each other's files.  Doc. 28, Ex. 36.  Howrey

17  also represents Foster in unrelated litigation against ConAgra; ConAgra has not moved to

18  disqualify Howrey in those proceedings.

19         ConAgra made a formal motion to disqualify Howrey and filed a brief on September 8,

20  2004 that was referred to the Magistrate Judge. Doc. 14, ConAgra's Memo.  Foster filed an

21  opposition on October 25, 2004. Doc. 21, Foster's Opposition.  ConAgra made a reply on

22  November 5, 2005. Doc. 30.  Magistrate Judge Lawrence O'Neill issued an Order November 8,

23  2004 denying the motion without oral argument and ordering the continued use of the ethical

24  wall. Doc. 34, Magistrate's Order.  ConAgra filed an objection to the Order denying the motion

25  on November 29, 2004. Doc. 35, ConAgra's Objections.  Howrey filed an opposition to the

26  objection on December 9, 2004. Doc. 35, Foster's Opposition.

27

28                                    **II. Legal Standards**

**A. Review of Nondispositive Magistrate Judge Orders**

"A magistrate judge to whom a pretrial matter not dispositive of a claim or defense of a party is referred to hear and determine shall promptly conduct such proceedings as are required and when appropriate enter into the record a written order setting forth the disposition of the matter. Within 10 days after being served with a copy of the magistrate judge's order, a party may serve and file objections to the order; a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made. The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." Fed. R. Civ. Proc. 72(a). The district court reviews a magistrate judge's non-dispositive order for clear error. 28 U.S.C. § 636(b)(1)(A). The district court "may not simply substitute its judgment for that of the deciding court." Grimes v. San Francisco, 951 F.2d 236, 241 (9th Cir. 1991). Rather, the district court must accept a magistrate judge's finding of fact unless the district court is left with the "definite and firm conviction that a mistake has been committed." United States v. Hughes Aircraft Co., 162 F.3d 1027, 1030 (9th Cir. 1999). The Ninth Circuit has said that "[t]o be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must...strike us as wrong with the force of a five-week-week-old unrefrigerated dead fish." Hayes v. Woodford, 301 F.3d 1054, 1067 n.8 (9th Cir. 2002).

**B. Attorney Disqualification**

Local Rule 83-180(e) of the Eastern District of California states that the "standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the rules of Professional Conduct of the State Bar of California and decisions of any Court applicable thereto...are hereby adopted as standards of professional conduct in this Court. In the absence of an applicable standard therein, the Model Code of Professional Responsibility of the American Bar Association may be considered guidance." The court has inherent supervisory power and the authority to oversee the professional conduct of lawyers who appear before it. Zador Corp. v. Kwan, 31 Cal. App. 4th 1285, 1292 (Cal. Ct. App. 1995). The

1  court's supervisory power includes authority to disqualify an attorney appearing in a case, if

2  necessary to maintain public confidences in the legal profession and to protect the integrity of the

3  judicial proceeding. <u>Truck Ins. Exchange v. Fireman's Fund</u>, 6 Cal. App. 4th 1050, 1055 (Cal.

4  Ct. App. 1992)*; see also* <u>Freeman v. Chicago Musical Instrument Co.</u>, 689 F.2d 715, 721 (7th

5  Cir. 1982).

6       When entertaining a motion to disqualify counsel,

7       the court must weigh the combined effect of a party's right to counsel of choice, an
   attorney's interest in representing a client, the financial burden on a client of replacing
8       disqualified counsel and any tactical abuse underlying a disqualification proceeding
   against the fundamental principle that the fair resolution of disputes within our adversary
9       system requires vigorous representation of parties by independent counsel unencumbered
   by conflicts of interest.

10  <u>Allen v. Academic Games League of America, Inc.</u>, 831 F. Supp. 785, 789 (C.D. Cal. 1993),

11  quoting <u>In re Lee G.</u>, 1 Cal. App. 4th 17, 26 (Cal. Ct. App. 1991).  Motions to disqualify counsel

12  are viewed with extreme caution since they can be misused as techniques of harassment and tend

13  to deprive a party of representation of their choice. <u>Richardson-Merrell, Inc. v. Koller</u>*, 472 U.S.

14  424, 436 (1985); <u>Comden v. Superior Court</u>, 20 Cal. 3d 906, 915 (Cal. 1978).

15

16  **III. Discussion**

17       The California Bar Rules of Professional Conduct state in relevant part: "A member shall

18  not, without the informed written consent of the client or former client, accept employment

19  adverse to the client or former client where, by reason of the representation of the client or

20  former client, the member has obtained confidential information material to the employment."

21  Cal. Bar Rules, Prof'l Conduct Rule 3-310(e).

22       Where the potential conflict is one that arises from the successive representation of
   clients with potentially adverse interests, the courts have recognized that the chief
23       fiduciary value jeopardized is that of client confidentiality. Thus, where a former client
   seeks to have a previous attorney disqualified from serving as counsel to a successive
24       client in litigation adverse to the interests of the first client, the governing test requires
   that the client demonstrate a 'substantial relationship' between the subjects of the
25       antecedent and current representations....Where the requisite substantial relationship
   between the subjects of the prior and the current representations can be demonstrated,
26       access to confidential information by the attorney in the course of the first representation
   (relevant, by definition, to the second representation) is presumed and disqualification of
27       the attorney's representation of the second client is mandatory; indeed, the disqualification
   extends vicariously to the entire firm.

28  <u>Flatt v. Superior Court</u>, 9 Cal. 4th 275, 283 (Cal. 1994).  "The 'substantial' relationship test

mediates between two interests that are in tension...the freedom of the subsequent client to counsel of choice, on the one hand, and the interest of the former client in ensuring the permanent confidentiality of matters disclosed to the attorney in the course of the prior representation, on the other." <u>Flatt v. Superior Court</u>, 9 Cal. 4th 275, 283 (Cal. 1994). A party's decision as to counsel of choice should not be disturbed absent a compelling reason. When an individual attorney holds confidential information, that knowledge is imputed to the entire law firm with which he/she is associated. California law is not absolutely clear as to the efficacy of ethical walls. Nevertheless, the general judicial consensus holds that ethical walls can rebut the presumption that information is shared between attorneys at the same law firm.

**A. Substantial Relationship Standard**

When there is a substantial relationship between successive representations, attorney disqualification is warranted. An earlier case laid out three factors to be considered in determining whether there is a substantial relationship: 1) factual similarities in the two representations, 2) legal similarities in the two representations, and 3) nature and extent of the individual attorney's involvement in the previous case.[1] <u>H.F. Ahmanson & Co. v. Salomon Brothers, Inc.</u>, 229 Cal. App. 3d 1445, 1456-57 (Cal. Ct. App. 1991), adopting the analysis of <u>Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.</u>, 518 F.2d 751 (2nd Cir. 1975). The party seeking the disqualification must show by a preponderance of the evidence that a substantial relationship exists. <u>H. F. Ahmanson & Co. v. Salomon Brothers, Inc.</u>, 229 Cal. App.

---

[1]Technically, <u>Ahmanson</u> says that the third prong should be the individual attorney's involvement in both the old and new cases. <u>H.F. Ahmanson & Co. v. Salomon Brothers, Inc.</u>, 229 Cal. App. 3d 1445, 1457 (Cal. Ct. App. 1991) ("The Nature and Extent of the Attorney's Involvement With the Cases"). However, the analysis only discusses the attorney's involvement in the previous matter. Later cases have interpreted the third <u>Ahmanson</u> factor as referring only to the attorney's involvement with the previous matter. See, e.g. <u>Adams v. Aerojet-General Corp.</u>, 86 Cal. App. 4th 1324, 1332 (Cal. Ct. App. 2001). The nature and extent of the attorney's involvement in the new case is not a factor of the substantial relationship test. This understanding of <u>Ahmanson</u> is consistent with the rule that disqualification of an attorney is automatically imputed to his/her law firm.

3d 1445, 1452 (Cal. Ct. App. 1991).   Information communicated to an attorney, and therefore constructively available to the law firm is not automatically imputed to a different attorney when he/she leaves to join a new firm. Adams v. Aerojet-General Corp., 86 Cal. App. 4th 1324, 1334 (Cal. Ct. App. 2001).

The term 'substantial relationship' itself  is subject to imprecise use with some courts using the term to refer to only part of the test for disqualification. See H.F. Ahmanson & Co. v. Salomon Brothers, Inc., 229 Cal. App. 3d 1445, 1454 (Cal. Ct. App. 1991) ("[T]he attorney's possession of confidential information will be presumed only when 'a substantial relationship has been shown to exist between the former representation and the current representation, and when it appears by virtue of the nature of the former representation or the relationship of the attorney to his former client confidential information material to the current dispute would normally have been imparted to the attorney.'"), quoting Johnson v. Superior Court, 159 Cal. App. 3d 573, 578 (Cal. Ct. App. 1984); Rosenfeld Construction Co. v. Superior Court, 235 Cal. App. 3d 566, 574 (Cal. Ct. App. 1991) ("When a substantial relationship has been shown to exist between the former representation and the current representation, and when it appears by virtue of the nature of the former representation or the relationship of the attorney to his former client confidential information material to the current dispute would normally have been imparted to the attorney or to subordinates for whose legal work he was responsible, the attorney's knowledge of confidential information is presumed."), quoting Global Van Lines, Inc. v. Superior Court, 144 Cal. App. 3d 483, 489 (Cal. Ct. App. 1983).  At base, the complete test for disqualification under substantial relationship comprises two parts.  First, the factual and legal issues in the old and new cases must be related.  Second, the attorney must have been in a position where material client confidential information would normally have been communicated.  Together, these two factors allow a presumption that the attorney received client confidential information material to the present legal dispute. Adams v. Aerojet-General Corp., 86 Cal. App. 4th 1324, 1331 (Cal. Ct. App. 2001).

With reference to factual and legal similarity, the evaluation must be wide ranging and flexible.

Depending upon the nature of the attorney's relationship with the former client, in the office or in the courtroom, the attorney may acquire confidential information about the client or the client's affairs which may not be directly related to the transaction or lawsuit at hand but which the attorney comes to know in providing the representation to the former client with respect to the previous lawsuit or transaction. For example, whether a lawsuit is settled or contested may depend upon a myriad of considerations about the client's affairs which might not be subject to discovery but which nonetheless determine the client's course of action, such as a decision to settle an action or a particular claim or issue because of the potential for unrelated adverse ramifications to the client were the case to go to trial. The same might be true about the client's internal operations or policies, such as one which favors the settlement of lawsuits filed in some locales but not others based upon the client's history or perceptions about the inclinations of juries (or the capabilities of the bench) in the particular venues.....We therefore ascribe to the word "subjects" a broader definition than the discrete legal and factual issues involved in the compared representations. We consider the "subject" of a representation as including information material to the evaluation, prosecution, settlement or accomplishment of the litigation or transaction given its specific legal and factual issues. Thus, successive representations will be "substantially related" when the evidence before the trial court supports a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues.

Jessen v. Hartford Casualty Ins. Co., 111 Cal. App. 4th 698, 712-13 (Cal. Ct. App. 2003) (citations omitted). Conversely, this analysis must be done with the admonition that the test is a pragmatic one, and "to apply the remedy of disqualification when there is no realistic chance that confidences were disclosed would go far beyond the purpose of the substantial relationship test." H.F. Ahmanson & Co. v. Salomon Brothers, Inc., 229 Cal. App. 3d 1445, 1455 (Cal. Ct. App. 1991). "We recognize that what we have just articulated is anything but a 'bright line' standard, but it does not saddle the trial courts with an impossible task. In many contexts, exacting specificity in the law is unrealistic, so the relevant legal principles are only generally stated and must be applied to individual cases by the exercise of the court's considered judgment based in reason, logic and common sense." Jessen v. Hartford Casualty Ins. Co., 111 Cal. App. 4th 698, 713 (Cal. Ct. App. 2003) (citations omitted).

"Disqualification of an attorney from undertaking representation adverse to a former client does not require proof that the attorney actually possesses confidential information." Adams v. Aerojet-General Corp., 86 Cal. App. 4th 1324, 1331 (Cal. Ct. App. 2001). In general, "it is not within the power of the former client to prove what is in the mind of the attorney." Global Van Lines, Inc. v. Superior Court, 144 Cal. App. 3d 483, 489 (Cal. Ct. App. 1983). Actual inquiry into what an attorney knows can lead to the "ironic result of disclosing the former

client's confidences and secrets through an inquiry into the actual state of the lawyer's knowledge and information in the subsequent representations." Jessen v. Hartford Casualty Ins. Co., 111 Cal. App. 4th 698, 706 (Cal. Ct. App. 2003).  Should a party decide to show actual possession of information, it may do so as possession of relevant client confidences is an alternate basis for disqualification. H.F. Ahmanson & Co. v. Salomon Brothers, Inc., 229 Cal. App. 3d 1445, 1459 (Cal. Ct. App. 1991).  An attorney may also rebut a showing of substantial relationship by proving that he/she "had no personal involvement in such substantially related matters and did not actually receive any confidential information relevant to the matter in which disqualification is sought." Trone v. Smith, 621 F.2d 994, 998 n.3 (9th Cir. 1980), citations omitted.

**B. Transmission of Confidential Information**

Howrey's work on behalf of ConAgra in preparing an HSR did not ultimately involve a government challenge to the sale of its fresh chicken business.  The Magistrate Judge characterized Howrey's prior representation of ConAgra as involving "neither litigation nor adverse matters involving the conduct and issues at stake here." Doc. 34, Magistrate's Order, at 9:21-22.  ConAgra correctly points out that "[t]he distinction between antitrust litigation and preparation for antitrust litigation has no place in this conflict of interest analysis." Doc. 35, ConAgra's Objections, at 4:7-8.  For disqualification purposes, it is the representation of a client that matters; the fact that the representation "did not involve litigation" is immaterial. In re Airport Car Rental Antitrust Litigation, 470 F. Supp. 495, 501 (N.D. Cal. 1979).  Confidential information passes from client to attorney as readily in a representation without litigation as in a representation that results in court appearance.

Though the Magistrate Judge did not address this issue independently, he did state that "Howrey received confidential information regarding ConAgra's internal operations, attitudes and policies regarding antitrust issues, organizational structure, litigation philisophy, and methods and procedures regarding litigation." Doc. 35, ConAgra's Objections, at 9:12-15. According to the records provided, Howrey attorneys spent 213.50 hours on Project Mayflower

1    (all in June 2003) and billed ConAgra a total of $72,490.58. Doc. 15, Ex. 2, Billing Records, at

2    25.  Among the activities that Howrey attorneys undertook was "review supply agreements";

3    "obtain and review ConAgra document for HSR filing"; "review strategic plans for ConAgra

4    poultry unit"; and "review CA strategic business plans." Doc. 15, Ex. 2, Billing Records.  From

5    the billing records, it is clear that Howrey's representation of ConAgra involved revelation of

6    ConAgra's strategic plans, which should contain nonpublic business information.  The attorney

7    client relationship was such that confidential information would ordinarily have been transmitted

8    to Howrey.  However, ConAgra has not sufficiently shown that the confidential information

9    shared in Project Mayflower is material to this case.

11   **C. Factual and Legal Similarity**

12         The Magistrate Judge determined that the factual and legal issues raised in the previous

13   representation are not relevant to the current controversy. Doc. 34, Magistrate's Order, at

14   8:27:9:16.  His conclusion is that "ConAgra fails to make sufficient connection to establish a

15   requisite substantial relationship." Doc. 34, Magistrate's Order, at 9:15-16.  The Magistrate

16   Judge made a factual finding that the prior representation was largely focused on examining

17   antitrust in the chicken market while this case concerns precooked turkey. Doc. 34, Magistrate's

18   Order, at 9:1-2.  The relationship between these two matters is not direct.  ConAgra bears the

19   burden of showing how the two relate, how information from Project Mayflower would help

20   Foster in this case.  The fact that "both representations share a common area of law" is

21   insufficient. Laker Airways Ltd. v. Pan American WorldAirways, 103 F.R.D. 22, 40 (D.D.C.

22   1984).  At base, the Magistrate Judge determined that ConAgra failed to provide sufficient

23   evidence.  Reviewing the record, the court can not conclude the Magistrate Judge committed

24   clear error.

25         ConAgra's key argument is that Howrey analyzed the various submarkets involved in the

26   poultry business in preparing the HSR and was exposed to strategic planning information

27   including ConAgra's internal views of what constitutes relevant markets. Doc. 14, ConAgra's

28   Memo, at 8:13-22.  Among the activities that Howrey attorneys undertook was "review supply

1   agreements"; "obtain and review ConAgra document for HSR filing"; "review strategic plans for

2   ConAgra poultry unit"; and "review CA strategic business plans." Doc. 15, Ex. 2, Billing

3   Records.  In the context of an antitrust suit, "possible access to the business strategies of a former

4   client might put the attorney in a position to acquire 'knowledge casting light on the purpose of

5   later acts and agreements' which underlie the antitrust action." Haagen-Dazs Co. v. Perche No!

6   Gelato, Inc., 639 F. Supp. 282, 286 (N.D. Cal. 1986), quoting Chugach Electric Association v.

7   United States District Court, 370 F.2d 441, 443 (9th Cir. 1966).  Further, ConAgra points to a

8   specific billing entry which shows that though Project Mayflower involved the sale of ConAgra's

9   fresh chicken business, a Howrey attorney had a "telephone conference with Mr. Wright re

10  turkey business." Doc. 15, Ex. 2, Billing Records, at 21.

11          As Jensen cautioned, "the relevant legal principles are only generally stated and must be

12  applied to individual cases by the exercise of the court's considered judgment based in reason,

13  logic and common sense." Jessen v. Hartford Casualty Ins. Co., 111 Cal. App. 4th 698, 713 (Cal.

14  Ct. App. 2003) (citations omitted).  In one instructive case, Haagen-Dazs sued Double Rainbow,

15  alleging antitrust violations in the super premium ice cream market. Haagen-Dazs Co. v. Perche

16  No! Gelato, Inc., 639 F. Supp. 282 (N.D. Cal. 1986).  An attorney with the firm representing

17  Double Rainbow had worked as a senior attorney in the legal department of Pillsbury for 10

18  years.  In his ninth year of employment, Pillsbury acquired Haagen-Dazs; the attorney then

19  worked on some projects involving ice cream.  During that time, the Pillsbury legal department

20  defended Haagen-Dazs against an antitrust suit brought by Ben & Jerry's regarding "issues

21  identical or similar" to the contemporary case. Haagen-Dazs Co. v. Perche No! Gelato, Inc., 639

22  F. Supp. 282, 284-85 (N.D. Cal. 1986).  Haagen-Dazs also alleged the attorney had confidential

23  information regarding its ice cream acquisition and marketing strategy.  The Northern District

24  found that the circumstances made it highly likely the attorney "had information concerning

25  Haagen-Dazs' domestic distribution strategies" and "was privy to information about [the Ben &

26  Jerry] litigation which is, in itself, substantially related to this litigation," mandating

27  disqualification. Haagen-Dazs Co. v. Perche No! Gelato, Inc., 639 F. Supp. 282, 286 (N.D. Cal.

28  1986).  The relationship between the prior and latter representations are clear and direct.  The

                                             11

attorney had confidential information about the client's business strategy in the super premium

ice cream market and information about the former client's response in a suit on almost identical

issues.

ConAgra relies on a Fifth Circuit case applying Texas law, In re American Airlines, Inc.,

972 F.2d 605 (5th Cir. 1992), to illustrate the use of the substantial relationship test in the context

of antitrust.[2] Doc. 14, ConAgra's Memo, at 6:18-7:16.  In American Airlines, a law firm had

represented American in three previous matters.  The law firm then sought to represent

Northwestern in an antitrust suit against American, claiming that American had attempted to

monopolize the national market and four regional markets for air travel.  The Fifth Circuit found

that each previous matter, by itself, was sufficient to warrant disqualification.  One of the three

previous matters involved a proposed purchase of Continental by American.  The law firm

---

[2]The court notes that Texas standards on attorney disqualification are different than California standards.  Texas uses the substantial relationship test in evaluating successive representations to address two fundamental concerns: "a client's interest in preserving his confidential information....[and] the client's interest in the loyalty of his attorney." In re American Airlines, Inc., 972 F.2d 605, 616 (5th Cir. 1992).  In contrast, California courts have found that the substantial relationship test should only be used to address the issue of client confidentiality.  "Where the potential conflict is one that arises from the successive representation of clients with potentially adverse interests, the courts have recognized that the chief fiduciary value jeopardized is that of client confidentiality....The primary value at stake in cases of simultaneous or dual representation is the attorney's duty--and the client's legitimate expectation--of loyalty, rather than confidentiality....the substantial relationship test is founded on the need to protect against the improper use of client secrets...such a test does not set a sufficiently high standard by which the necessity for disqualification should be determined in cases involving dual representation." Flatt v. Superior Court, 9 Cal. 4th 275, 283-84 (Cal. 1994).  In Texas, "prior representations in which the attorney advised the client but received no confidential information" warrants disqualification as the duty of loyalty is implicated. In re American Airlines, Inc., 972 F.2d 605, 619 (5th Cir. 1992).  Under the same facts, disqualification would not be required in California.  The extent to which enforcing the duty of loyalty was ultimately relied upon to disqualify the law firm in American Airlines is unclear as the Fifth Circuit found that the Texas version of the substantial relationship test fully addressed the concerns of loyalty.  The court did go on to say as dicta, "We believe that disqualification of [law firm] would be appropriate even under the relaxed 'actual prejudice' or 'taint' standard [only looking at client confidences] Northwest urges this court to adopt." In re American Airlines, Inc., 972 F.2d 605, 619 (5th Cir. 1992)

1  examined the antitrust implications of the combination, focusing on whether the Department of
2  Justice would challenge the merger.  The Fifth Circuit found that the law firm actually undertook
3  a detailed analysis of the antitrust implications of an American-Continental combination in
4  several regional markets. In re American Airlines, Inc., 972 F.2d 605, 626-27 (5th Cir. 1992).
5  Further, the law firm was "privy to American's views of the relevant air transportation markets, a
6  related matter that will also be at issue in the present case." In re American Airlines, Inc., 972
7  F.2d 605, 627 (5th Cir. 1992).  Northwest then relied on that confidential information in
8  formulating its complaint, arguing that the relevant markets for air travel must include regional
9  markets in addition to the national market.  Based on these points, the Fifth Circuit found that
10 "American has succeeded in delineating with specificity the subject matters, issues and causes of
11 action common to prior and present representations." In re American Airlines, Inc., 972 F.2d 605,
12 628 (5th Cir. 1992) (citations omitted).  The basis for disqualification, again, is a clear and direct
13 relationship between the two representations.  The law firm had confidential information about
14 what American considered to be the relevant regional air markets; the suit involved defining
15 what relevant regional air markets were.

16      With ConAgra, Foster, and Howrey, the relationship between the two representations is
17 much more attenuated.  Linking the two requires an extra logical step.  The evidence shows that
18 Howrey examined the poultry market with reference to fresh chickens in Project Mayflower.  The
19 current dispute concerns precooked turkey meat.  Aside from the billing entries, ConAgra
20 provided the declaration of David Roe, shareholder for McGrath North who represented
21 ConAgra in Project Mayflower.  "Specifically with regard to ConAgra's poultry business,
22 including chicken and turkey, Mr. Rill, while at Howrey, (and while at Collier Shannon)
23 provided substantive legal advice with regard to the appropriate relevant product market and
24 relevant geographic market that applied to ConAgra's extensive poultry businesses. In
25 connection with these engagements, ConAgra shared with Messrs. Rill and MacAvoy and
26 Howrey substantial amounts of ConAgra's sensitive and strategic business information, including
27 information dealing with the production, marketing, promotion, distribution and sale of poultry,
28 including chicken and turkey." Doc. 15, Roe Declaration, at 2:27-3:5.  Mr. Roe does not say that

1   Mr. Rill and MacAvoy looked to the precooked turkey market specifically, nor does he say that

2   ConAgra provided strategic information on precooked turkey specifically.  Foster has provided

3   the declaration of Mr. Rill.  In describing the work Howrey undertook in Project Mayflower, he

4   states:

5           Our antitrust analysis did not assess the transaction's competitive effects in a putative
            'poultry' market that included both chicken and turkey, nor did the draft white paper
6           argue that 'poultry' was a relevant market or line of commerce...We believed that the
            Deaprtment of Justice and Federal Trade Commission were unlikely to consider chicken
7           and turkey to be in the same relevant market for purposes of merger
            analysis...Accordingly, in analyzing Pilgrim's acquisition of ConAgra's chicken business,
8           we addressed its potential effects on the chicken market and potential smaller markets
            contained therein, such as branded chicken, private label chicken, fresh chicken, and
9           further processed chicken....Since both ConAgra and Pilgrim's Pride remained in the
            turkey business, our analysis addressed potential antitrust issues raised by this limited
10          passive stock ownership. Our analysis of the turkey business had nothing to do with the
            relevant market analysis discussed in the preceding paragraph, which was limited to
11          chicken products. No detailed analysis of competition in the turkey market was
            undertaken.

12  Doc. 24, MacAvoy, Declaration, at 3:17-4:9.  The Magistrate Judge determined as a factual

13  matter that ConAgra neither provided Howrey with detailed information about the turkey market

14  nor gave it information that would be pertinent in determining whether the various chicken

15  businesses impacted the turkey businesses under relevant market analysis.

16          Conagra has not met its burden of showing the Magistrate Judge's factual findings

17  constitute clear error.  Howrey's representations of Conagra in Project Mayflower and Foster in

18  this case do not share sufficient factual and legal similarities to warrant disqualification; there is

19  no substantial relationship between the representations.

20

21  **D. Ethical Wall**

22          Howrey claims to have erected an ethical wall, cordoning off lawyers who worked on the

23  Project Mayflower matter from its current representation of Foster.  The Magistrate Judge found

24  the ethical wall effective. Doc. 34, Magistrate's Order, at 10:17-18.  ConAgra argues that an

25  ethical wall's use is limited to the entry of new attorneys to shield the rest of the firm from their

26  previous representations and that Howrey's ethical wall was untimely erected. Doc. 35,

27  ConAgra's Objections, at 11:3-6 and 7:27.  As it has been determined that there is no substantial

28  relationship necessitating the establishment of an ethical wall to prevent disqualification of the

**14**

entire law firm (as opposed to disqualification of individual attorneys), this court expresses no opinion as to the efficacy of the ethical wall

### IV. Conclusion

The Magistrate Judge's denial of Conagra's motion to disqualify counsel is AFFIRMED.

IT IS SO ORDERED.

**Dated:**   **September 22, 2005**             **/s/ Anthony W. Ishii**
h7ehd6                                                 UNITED STATES DISTRICT JUDGE